UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 22-20013-CR-ALTMAN

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

ELIEZER MENAS ASPRILLA,
JULIO CESAR RAMIREZ MOTA,
HENRY MANUEL CASTRO RAMIREZ, and
DANNY ALEXANDER CARRERA-BERNABE,

    Defendants.
    _____/

## JOINT MOTION TO DISMISS INDICTMENT

Eliezer Menas Asprilla, by and through undersigned counsel, and joined by codefendants Julio Cesar Ramirez Mota, Henry Manuel Castro Ramirez, and Danny Alexander Carrera-Bernabe, respectfully moves this Honorable Court, pursuant to Fed. R. Crim. P. 12(b), to dismiss the indictment for lack of jurisdiction and unreasonable delay in presentment. In support thereof, he states the following.

**Procedural History**

1. According to the allegations in the criminal complaint, Mr. Menas Asprilla and his codefendants were arrested on December 24, 2021, on a vessel in the Caribbean Sea approximately 150 nautical miles south of Santo Domingo, Dominican Republic. (DE 1 ¶ 3).

2. Mr. Menas Asprilla and his codefendants were subsequently transported to the Southern District of Florida, where they arrived on January 4,

2022, and were promptly interrogated by members of the DEA Miami Field Division Office. Upon information and belief, during the 11–12 days between arrest and arrival, Mr. Menas Asprilla was transported between three different Coast Guard vessels, which made stops in multiple places, including Puerto Rico.

3. The criminal complaint was filed on January 5, 2022—12 days after Mr. Menas Asprilla was arrested and held prisoner of the U.S. Coast Guard—and charged Mr. Menas Asprilla and his codefendants with conspiracy to possess with intent to distribute a controlled substance while on board a vessel subject to the jurisdiction of the United States, in violation of 46 U.S.C. § 70503(a)(1) & 70506(b), also known as the Maritime Drug Enforcement Act or MDLEA. (DE 1). On the same day, Mr. Menas Asprilla and his codefendants made their initial appearances. (DE 2).

4. After the government sought and obtained a continuance of the arraignment date, Mr. Menas Asprilla and his codefendants were charged by indictment with conspiracy to possess with intent to distribute a controlled substance on board a vessel subject to the jurisdiction of the United States and possessing with intent to distribute a controlled substance on board a vessel subject to the jurisdiction of the United States. (DE 14; *see also* DE 11–12). They were each arraigned shortly thereafter. (DE 16–19).

5. Mr. Menas Asprilla now moves this Honorable Court to dismiss the indictment for lack of subject matter jurisdiction based on the unconstitutional application of the MDLEA to an individual arrested on board a vessel within the Exclusive Economic Zone (or EEZ) of the Dominican Republic. The EEZ is not within

the "high Seas" as defined by customary international law, and this alleged offense therefore falls outside of Congress's limited Article I, Section 8, Clause 10 authority to "define and punish . . . Felonies committed on the high Seas." (Issue I).

6. Mr. Menas Asprilla also moves to dismiss the indictment as a sanction for the unreasonable, unnecessary, and unlawful delay resulting in his detention for nearly two weeks without judicial oversight. (Issue II).

7. Finally, Mr. Menas Asprilla moves to dismiss for lack of statutory jurisdiction, as the government has not established that the vessel was a "vessel without nationality," and therefore subject to the jurisdiction of the United States, pursuant to 46 U.S.C. § 70502(c)(1)(A) & (d)(1)(A)–(C). (Issue III).

8. Mr. Menas Asprilla respectfully requests an evidentiary hearing as it is necessary, at a minimum, to establish the government's reasons for the delay and the lack of statutory jurisdiction.

## MEMORANDUM OF LAW

**I.  The United States' authority pursuant to the MDLEA is limited to offenses occurring on the high Seas; because this alleged offense took place within the Exclusive Economic Zone of the Dominican Republic, it did not occur on the "high Seas," and the indictment must be dismissed.**

Congress's authority to enact the MDLEA (46 U.S.C. § 70501 *et seq.*) emanates solely from its Article I, Section 8, Clause 10 power to "define and punish . . . Felonies committed on the high Seas" (*i.e.* the Felonies Clause). *See United States v. Bellaizac-Hurtado,* 700 F.3d 1245, 1258 (11th Cir. 2012) (holding that Congress could not proscribe drug trafficking under the Offences Clause of Article I, Section 8, Clause

3

10, because it is not an offense against the Law of Nations); *United States v. Davila-Mendoza*, 972 F.3d 1264 (11th Cir. 2020) (holding that Congress lacked the power to enact the MDLEA pursuant to the Foreign Commerce Clause and rejecting the government's alternative argument that the statute was passed as a necessary and proper exercise of the Treaty power); *see also United States v. Cruickshank*, 837 F.3d 1182, 1187 (11th Cir. 2016); *United States v. Davila-Reyes*, 23 F.4th 153, 169 (1st Cir. 2022).

Accordingly, as the plain text makes clear, Congress's power to act under the Felonies Clause is limited to offenses "committed on the high Seas." U.S. Const. art. I, § 8, cl. 10; *see also Bellaizac-Hurtado*, 700 F.3d at 1258 (holding that "Congress exceeded its power, under the Offences Clause, when it proscribed the defendants' conduct in the territorial waters of Panama."). Because this alleged offense did not occur on the "high Seas," the allegations in the indictment fall outside of Congress's enumerated powers, and this Court lacks jurisdiction to adjudicate the offense. Stated differently, the MDLEA is unconstitutional as applied to Mr. Mena Asprilla's alleged conduct, and the indictment must be dismissed.

  A. <u>The Felonies Clause is textually limited to conduct on the high Seas.</u>

Article I, Section 8, Clause 10, also known as the "Define and Punish Clause," grants Congress the authority to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S. Const. art. I, § 8, cl. 10. This Clause contains three distinct grants of power: "the power to define and punish piracies [the Piracy Clause], the power to define and punish felonies

4

committed on the high seas [the Felonies Clause], and the power to define and punish offenses against the law of nations [the Offences Clause]." *Bellaizac-Hurtado*, 700 F.3d at 1249. The only clause potentially applicable to the prosecution of Mr. Menas Asprilla is the Felonies Clause, *i.e.* Congress's "power to define and punish felonies committed on the high seas." *Id.* But—plainly—that power is "textually limited to conduct *on the high seas.*" *Id.* at 1248 (emphasis added) (citing U.S. Const., art. I, § 8, cl. 10).

For a "district court to have adjudicatory authority over a charge that a defendant conspired to violate the substantive crime defined in [the MDLEA], the Government must preliminarily show that the conspiracy's vessel was, *when apprehended*, subject to the jurisdiction of the United States." *United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016) (emphasis added) (quoting *United States v. De La Garza*, 516 F.3d 1266, 1272 (11th Cir. 2008)).

Thus, the question is whether the waters located with Dominican Republic's Exclusive Economic Zone are part of the high Seas within the meaning of Article I, Section 8, Clause 10. They are not.

### B. Congress's power to prosecute "Felonies on the high Seas" is limited by customary international law.

The Constitutional Framers incorporated customary international law as a limit on Congress's authority under the Felonies Clause. *See Bellaizac-Hurtado*, 700 F.3d at 1248–49. The First Circuit recently undertook an exceptionally thorough and persuasive review of the historical record (including the Framers' own statements) and legal precedent, which confirmed the same. *See Davila-Reyes*, 23 F.4th at 173–

5

86. Although it arose in a different challenge to the MDLEA, the First Circuit's analysis, reasoning and conclusion that the Framers incorporated international law as a restraint on Congress's authority pursuant to the Felonies Clause is highly persuasive here.

As a general matter, the Framers were deeply committed to international law and saw, as their "primary goal," "improving the new nation's ability to meet its obligations to other countries under international law." *Id.* at 174; *see also id.* at 175–76 (explaining that, for both pragmatic and ideological reasons, "as they embarked on drafting a constitution, the Framers saw a federal system capable of upholding international law as an imperative for the United States to achieve equal status in the community of nations."). Consistent with these goals and concerns, "the Framers viewed international law as a restraint on Congress's enumerated powers bearing on foreign relations." *Id.* at 176.

This is particularly evident in Article I, Section 8, Clause 10 (the Define and Punish Clause). The Define and Punish Clause is made up of phrases borrowed from international law; "Offences against the Law of Nations," "Piracies," and "Felonies" are "all concepts taken directly from international law." *Id.* These phrases were "familiar shorthand" for "international law concepts" and their inclusion in the Constitution is "strong evidence that the Framers intended the Define and Punish clause to align with the international law understanding of those terms." *Id.*[1]

---

[1] The Framers' decision to treat "Piracies" and "Felonies" distinctly within the Define and Punish Clause is also evidence that they intentionally incorporated international law into the Define and Punish Clause. At the time, and consistent with

6

As the First Circuit concluded, "there can be no doubt that the Constitution's drafters intended that Congress's authority under [the Felonies Clause] be constrained by currently applicable international law whenever Congress invokes that Clause to assert its authority over foreign nationals and their vessels on the high seas." *Id.* at 183. Thus, the United States can only exercise jurisdiction over vessels on the high seas *as defined by customary international law*. Put differently, Congress's authority to "define and punish . . . Felonies committed on the high Seas" goes only as far as international law permits; by original design, Congress may not expand the definition of the "high seas" beyond that provided by international law.

The First Circuit's persuasive originalist analysis is entirely consistent with Eleventh Circuit precedent. In *Bellaizac-Hurtado*, the Eleventh Circuit analyzed Congress's power to define and punish offenses against the law of nations (the Offences Clause), and explained that the "text, history, and structure of the

---

international law, piracy was understood to be a crime of universal jurisdiction, meaning that it could be punished by any country no matter where it was committed or by whom. *Id.* at 178–180. Felonies, *i.e.*, serious crimes other than piracy, were not—even if committed on the high seas. "It was a well-accepted principle of international law that countries could enact statutes criminalizing conduct on the high seas other than piracy, *but only* as to a given country's own nationals or on vessels over which the country could exercise jurisdiction pursuant to international law. *Davila Reyes*, 23 F.4th at 179–180 (citing numerous primary and secondary sources). Thus, by separating "Piracies" and "Felonies" in the Define and Punish Clause, the Framers "manifest[ed] an intent to distinguish between crimes with different jurisdictional limits under international law: classic piracy, which can be punished no matter where committed or by whom, and Felonies, which can be punished only if committed by U.S. nationals or on vessels subject to U.S. jurisdiction under international law" while on the high seas. *Id.* (footnote omitted).

7

Constitution confirm that the power to 'define' is limited by the law of nations." 700 F.3d at 1249.

In other words, Congress's power to "define" means that it has the authority "to codify and explain offenses that had already been understood as offenses against the law of nations" not "the power to create or declare offenses against the law of nations." *Id.* at 1249–50; *see also id.* at 1249 (explaining that, "during the Founding period" the "word 'define' meant [t]o give the definition; to explain a thing by its qualities and to circumscribe; to mark limits."). This clause "does not grant Congress the authority to punish conduct that is not a violation of the laws of nations." *Id.* at 1249. "The insertion of the power to 'define' enabled Congress to provide notice to the people through codification; it did not enable Congress to create offenses that were not recognized by the law of nations." *Id.* at 1250.

The same reasoning and limitations apply to Congress's power to "define" felonies on the high seas. The power to "define and punish" in each phrase (to define and punish piracy, to define and punish felonies on the high seas, and to define and punish offenses committed against the laws of nations) is the same—and emanates from the singular use of the terms in the text. Thus, it does not give Congress the authority to recast the boundaries of the "high Seas" in order to expand its own sphere of authority. Instead, the "high Seas" referenced in Article I must be construed according to the definition of the high seas accorded by customary international law.

This understanding is further confirmed by our constitutional structure. As the Eleventh Circuit has noted, if "Congress could define any conduct as 'piracy' or as

8

a 'felony' or as an 'offense against the law of nations,' its power would be limitless and contrary to our constitutional structure." *Id.* Similarly here, the locus of the high Seas provides a substantive limit on Congress's authority to "define" felonies under Clause 10. If Congress were permitted to redefine the "high Seas" as it so chose, it could greatly expand the authority given to it by the Framers, in contravention of the very notion of enumerated powers. *See id.* For these reasons, this Court, too, should "look to international law to ascertain the scope" of the high Seas under the Felonies Clause. *See id.*; *cf. id.* at 1260 (Barkett, J., specially concurring).

In summary, Congress's authority to punish felonies on the high seas is limited to the "high Seas" as that term is defined by customary international law. And that definition, as explained below, *excludes* the EEZ.

    C. <u>The Exclusive Economic Zone is not the "high Seas" as defined by customary international law.</u>

The Exclusive Economic Zone, or EEZ, was recognized in the 1982 United Nations Convention on the Law of the Seas (UNCLOS), 1833 U.N.T.S. 397 (attached as Exhibit 1). "Under customary international law as reflected in Article 55 of the 1982 [UNCLOS], and with respect to other nations, exclusive economic zone means the waters seaward of and adjacent to the territorial sea, not extending beyond 200 nautical miles from the territorial sea baseline, as recognized by the United States." 33 C.F.R. § 2.30(b). Article 55 of UNCLOS states that the "exclusive economic zone is an area beyond and adjacent to the territorial sea, subject to the specific legal regime established by this Part, under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions

9

of this Convention." Under the UNCLOS, coastal states have sovereign rights regarding the conservation, management, and exploitation of natural resources within their EEZ. Article 58 provides that all states may enjoy the freedoms of navigation and overflight, as well as other "internationally lawful uses of the sea" within the EEZ.

Put simply, the EEZ is neither territorial waters nor the high seas. It is something distinct, with features of both. Most significant for present purposes, however, is that "under customary international law," the EEZ is *not the high seas*.

> Under customary international law as reflected in the 1982 United Nations Convention on the Law of the Sea and without prejudice to high seas freedoms that may be exercised within exclusive economic zones pursuant to article 58 of the United Nations Convention on the Law of the Sea, and unless the context clearly requires otherwise . . . **the high seas means waters that are not the exclusive economic zone** (as defined in § 2.30), territorial sea (as defined in § 2.22), or internal waters of the United States or any other nation.[2]

33 C.F.R. § 2.32(d) (emphasis added). While other definitions may be found, it is this definition of high seas—the one provided by customary international law—that is relevant and authoritative here.

In sum, Congress's Felonies Clause power—the sole constitutional authority under which it enacted the relevant provision of the MDLEA—is limited to offenses on the "high Seas" as that term is defined by customary international law. That definition, as discussed above, *excludes* the EEZ. Because Mr. Menas Asprilla was

---

[2] A different provision of the C.F.R. defines the "high seas" to include the EEZ for certain specific purposes. *See* 33 C.F.R. § 2.32(c). But for the reasons explained *infra*, this definition has no bearing on the meaning of Article I.

arrested within the EEZ of the Dominican Republic, and not on the high seas, the United States lacks jurisdiction over his offense. Put differently, because his alleged offense falls outside of Congress's limited Article I powers, this Court is without subject matter jurisdiction over his offense, and the indictment must be dismissed.

II. **The indictment should also be dismissed as a sanction for the government's violation of Federal Rule of Criminal Procedure 5, and pursuant to the outrageous government conduct doctrine, for detaining Mr. Menas Asprilla for nearly two weeks without judicial oversight.**

Mr. Menas Asprilla further moves this Court to dismiss his indictment based on the unreasonable, unnecessary, and unlawful delay between his arrest and the filing of charges and presentment before a magistrate.

A. <u>The government violated Rule 5(a) by failing to bring Mr. Menas Asprilla before a magistrate judge "without unnecessary delay."</u>

Federal Rule of Criminal Procedure 5(a)(1)(B) states: "A person making an arrest outside the United States must take the defendant without unnecessary delay before a magistrate judge, unless a statute provides otherwise." This requirement stems from common law, which "obliged an arresting officer to bring his prisoner before a magistrate as soon as he reasonably could." *Corley v. United States*, 556 U.S. 303, 306 (2009) (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 61–62 (1991) (Scalia, J., dissenting)). This presentment requirement—"which was the law in nearly every American State and the National Government"—"tended to prevent secret detention and served to inform a suspect of the charges against him[.]" *Id.* (citations omitted). The Supreme Court has found violations based on delays that can be counted in hours. *See Corley,* 556 U.S. at 322; *Mallory v. United States*, 354 U.S.

11

449, 455 (1957); *McNabb v. United States*, 318 U.S. 332, 345 (1943). The delay in Mr. Menas Asprilla's case was nearly two weeks. Under the circumstances, and following the reasoning of the Supreme Court and the text of Rule 5(a), this delay is far beyond what could be considered reasonable or necessary.

> B. The government violated Rule 5(b) by failing to secure a criminal complaint until 11–12 days after Mr. Menas Asprilla's arrest.

Similarly, the government disregarded the requirements of Federal Rules of Criminal Procedure 5(b), which states: "If a defendant is arrested without a warrant, a complaint meeting Rule 4(a)'s requirement of probable cause must be promptly filed in the district where the offense was allegedly committed."[3] This requirement stems from the Fourth Amendment's protection against unreasonable seizures and is generally held to require a judicial determination of probable cause within 48 hours of arrest. *See Gernstein v. Pugh* 420 U.S. 103 (1975). Any detention beyond that period without a judicial determination of probable cause is permissible only in the case of "a bona fide emergency or other extraordinary circumstance." *County of Riverside*, 500 U.S. at 57. Even a delay of less than 48 hours will be impermissible if it is unreasonable. "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *County of Riverside,* 500

---

[3] Because this alleged offense was committed outside the United States, the statute provides for venue in any district. *See* 46 U.S.C. § 70504(b)(2) ("Venue.--A person violating section 70503 or 70508-- (1) shall be tried in the district in which such offense was committed; or (2) if the offense was begun or committed upon the high seas, or elsewhere outside the jurisdiction of any particular State or district, may be tried in any district.").

12

U.S. at 56. Mr. Menas Asprilla was detained for 11–12 days before charges were filed and he was brought before a magistrate judge. The record fails to reveal a legitimate reason for the delay. Absent "a bona fide emergency or other extraordinary circumstances," such a delay cannot be considered anything but patently unreasonable. As a result, Mr. Menas Asprilla's rights under Rule 5 and the Due Process Clause of the Fifth Amendment were violated.

C. Dismissal is the appropriate sanction.

The government's actions in this case warrant dismissal—whether as a sanction for the Rule 5 violations, the unreasonable delay in presentment, or under the "outrageous" government conduct doctrine.

In 1973, Justice Rhenquist observed that the Court "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial process to obtain a conviction." *United States v. Russell*, 411 U.S. 423, 431–32 (1973). Such a situation might arise where the government's conduct violates "'fundamental fairness,'" or is "'shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *See id.* (citation omitted).

Arresting foreign nationals at sea and subjecting them to prolonged detention without access to the courts surely meets this standard. *See* Seth Freed Wessler, *The Coast Guard's 'Floating Guantanamos,'* N.Y. Times Magazine, Nov. 11, 2020, at 6 ("Maritime- and human-rights-law scholars caution that the delayed periods of

13

detention employed by the United States in its antidrug campaign run counter to international human rights norms.") (attached as Exhibit 2).

Furthermore, detainees are routinely kept in abhorrent conditions. *See id.* (describing how detainees are not told where they are going, not given lawyers, and are not permitted to contact their consulates or family members; are forced to wear "papery" jumpsuits, are cuffed at the ankles and chained to a cable running across the ground; are given rubber mats instead of beds, forced to defecate into a bucket, and subsist on insufficient food.).

Mr. Menas Asprilla was arrested and held captive by the United States government without access to any of the protections of the American judicial system for nearly two weeks. The government's conduct in this case, and as part of a pattern of callous disregard for the rights of the accused, requires that the indictment be dismissed.

### III. The indictment must also be dismissed because the government failed to establish statutory jurisdiction pursuant to 46 U.S.C. § 70502(d)(1).

Separate and apart from constitutional subject matter jurisdiction, the government must also establish statutory jurisdiction in order to prosecute someone under the MDLEA. These "strict requirements for establishing [statutory] jurisdiction over the vessel and people the government seeks to prosecute" are written into the statute. *United States v. Guerro*, 789 F. App'x 742, 744 (11th Cir. 2019). "When the government fails to follow these requirements, the MDLEA provides courts no jurisdiction over prosecutions under its terms." *Id.* In other words, the

government bears the burden of establishing statutory jurisdiction—*i.e.* of proving that the vessel was without nationality under the statute and therefore subject to the jurisdiction of the United States. *Guerro*, 789 F. App'x at 744, 746–47.

As the Court is aware, Mr. Menas Asprilla is charged with conspiracy to possess with intent to distribute, and possessing with intent to distribute, a controlled substance while on board covered vessel. 46 U.S.C. § 70503(a). A covered vessel is defined to include a "vessel subject to the jurisdiction of the United States." *Id.* § 70503(e)(1). A vessel subject to the jurisdiction of the United States is further defined to include a "vessel without nationality." *Id.* § 70502(c)(1)(A). And—finally—a "vessel without nationality" is:

> (A) a vessel aboard which the master or individual in charge makes a claim of registry that is denied by the nation whose registry is claimed;
>
> (B) a vessel aboard which the master or individual in charge fails, on request of an officer of the United States authorized to enforce applicable provisions of United States law, to make a claim of nationality or registry for that vessel; and
>
> (C) a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its nationality.

*Id.* § 70502(d)(1)(A)–(C).

Based on the complaint, the government will likely travel under subsection (d)(1)(B)—that the master or individual in charge failed, upon request, to make a claim of nationality or registry for the vessel. The plain text of the statute makes clear that the individuals on the vessel have no burden of volunteering information; rather, the Coast Guard bears the burden of asking the necessary questions to establish

15

jurisdiction. *Id.* § 70502(d)(1)(B); *see also Guerro*, 789 F. App'x at 750. Because the government has failed to establish that the Coast Guard asked the necessary questions to identify the master *or* individual in charge, or to establish whether said individual wished to make a claim or nationality *or* registry, it has failed to demonstrate statutory jurisdiction and the indictment must be dismissed.

## CONCLUSION

WHEREFORE, for the above reasons, Mr. Menas Asprilla moves this Court to dismiss the indictment. He further requests an evidentiary hearing. Counsel for codefendants Ramirez Mota, Castro Ramirez, and Carrera-Bernabe have advised that they join the instant motion.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

BY:  */s/ Kate Taylor*
Kate Taylor
Assistant Federal Public Defender
Special Bar No.: A5502484
150 West Flagler Street, Suite 1700
Miami, Florida 33130-1556
Tel:  305-530-7000
Fax:  305-536-4559
E-Mail: kate_taylor@fd.org

**CERTIFICATE OF SERVICE**

      I HEREBY certify that on **March 29, 2022**, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

                                              */s/ Kate Taylor*
                                              Kate Taylor